UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Hmong College Prep Academy,                              Civ. No. 21-1721 (PAM/BRT)

                Plaintiff,

v.                                                                              **MEMORANDUM AND ORDER**

Woodstock Capital, LLC and
Clark Reiner,

                Defendants.

---

This matter is before the Court on Defendants' Motion to Dismiss or Transfer and Plaintiff's Motion to Remand. For the following reasons, the Motions are denied.

## BACKGROUND[1]

Plaintiff Hmong College Prep Academy ("HCPA") is a non-profit K-12 charter school serving primarily low-income students in St. Paul, Minnesota. (Hang Decl. (Docket No. 19) ¶ 2; Compl. (Docket No. 1 Ex. 2) ¶ 1.) In Spring 2019, HCPA began exploring options to fund capital improvements, namely constructing a middle-school building. (Compl. ¶ 14.) Dr. Christiana Hang, HCPA's founder, superintendent, and Chief Financial Officer, inquired whether her friend Kay Yang, a hedge fund manager, knew of potential investors or donors interested in HCPA. (Hang Decl. ¶¶ 1, 6.) Although the school did not rule out investing in stock-market funds to raise capital, Hang did not request or authorize Yang to seek out such investment opportunities on HCPA's behalf. (Id. ¶¶ 5, 7.)

---

[1] As discussed more fully below, the procedural posture dictates that the Court accept as true all of HCPA's facts.

In May 2019, Yang contacted Paul Brown, an owner and manager of Defendant Woodstock Capital, LLC ("Woodstock GP"), a New Jersey company with its principal place of business in New Jersey. (Reiner Decl. (Docket No. 12) ¶ 3.) Woodstock GP is the general partner of Woodstock Capital Partners, LP ("Woodstock LP"), a Delaware company with its principal place of business in New Jersey. (Id.) Subsequently, Brown scheduled a call with Hang for August 16, 2019, to discuss the possibility of HCPA investing in Woodstock LP. (Hang Decl. ¶ 8; Brown Decl. (Docket No. 13) ¶ 8.) On that call, Brown assured Hang that any investment would comply with Minnesota law and HCPA's investment policy. (Hang Decl. ¶¶ 10-12.) Thereafter, Bill Miller, Woodstock GP's counsel, sent Hang a proposed "Addendum Letter of Agreement," which described how HCPA's potential investment would be allocated. (Id. ¶ 13.) Brown referred Yang's contact information to Clark Reiner, the Chief Executive Officer of Woodstock GP, who emailed Hang to introduce himself. (Brown Decl. ¶ 9; Hang Decl. Ex. A.) Reiner later emailed Hang a Subscription Agreement to purchase shares in the fund, and explained that he had filled out portions of it for HCPA. (Hang Decl. Ex. B.)

Throughout phone conversations and email exchanges in August and September 2019, Defendants again assured Hang that any potential investment in Woodstock LP would comply with HCPA's investment parameters. (Compl. ¶ 16.) At Hang's request, on September 6, 2019, Reiner executed a "side letter," which "outline[d] the specific types of securities that the Woodstock GP committed to purchase using HCPA's investment." (Id. ¶¶ 17-18; Hang Decl. Ex. C; Reiner Decl. ¶ 10.)

Ultimately, in September 2019, HCPA executed the Subscription Agreement to purchase shares in Woodstock LP, and Hang wired $5 million from HCPA's Minnesota-based bank account to Woodstock LP.  (Compl. ¶ 20; Hang Decl. ¶ 30.)  The next month, the funds began trading on the stock market.  (Reiner Decl. ¶ 14.)  HCPA's monthly statements showed the fund's value decreasing substantially.  When HCPA expressed concern to Woodstock GP about the decreasing value, Woodstock GP repeatedly informed HCPA that the statements did not reflect the true value of HCPA's interest, which remained at or near the original $5 million.  (Compl. ¶ 30.)

From October 2019 to March 2021, Woodstock GP's agents represented to Hang and HCPA's board members, directors, and accountants, via text messages, phone calls, and emails, that HCPA's "investment was secure [and] that the[] monthly statements only illustrated 'draw downs' from HCPA's initial pool of money as the money was invested."  (Hang Decl. ¶ 24.)  HCPA contends that Woodstock's GP's assurances induced HCPA to keep its investment with Woodstock LP.  (Id. ¶ 28.)  On March 9, 2021, for example, Woodstock GP maintained that HCPA's money was "all there."  (Compl. ¶ 34.)  Notwithstanding these guarantees, HCPA grew increasingly concerned and eventually sought to withdraw its money.  Woodstock GP ultimately agreed to buyout HCPA's interest in Woodstock LP.  (Hang ¶¶ 29, 31.)

On March 30, 2021, Woodstock GP informed HCPA's counsel that it had misrepresented the monthly statements, which accurately represented the balance of HCPA's investment.  (Compl. ¶ 38.)  Indeed, as of March 31, 2021, the balance had dwindled to $705,290.83.  (Id. ¶ 44.)  On April 29, 2021, Woodstock GP's attorneys sent a letter to

HCPA's counsel stating that Woodstock GP did not invest the $5 million per HCPA's stated investment parameters. (Id. ¶ 37.) HCPA's balance shrunk to $70,529.08, as of August 2021. (Reiner Decl. ¶ 15.) Woodstock GP has yet to buy out HCPA's limited partnership interest in Woodstock LP. (Compl. ¶ 39.)

On June 28, 2021, HCPA filed this lawsuit in Ramsey County, alleging a claim of (1) recission and fraudulent inducement against both Reiner and Woodstock GP, and claims of (2) breach of contract, (3) negligence, gross negligence, and breach of fiduciary duty, (4) specific performance, and (5) promissory estoppel against only Woodstock GP. HCPA seeks recession of the Subscription Agreement, money damages, specific performance of Defendants' contractual duty to provide audited financial statements, and enforcement of Woodstock GP's promise buy out HCPA's interest in Woodstock LP, as well as fees and costs. In August 2021, Defendants removed the lawsuit to this Court.

Defendants move to dismiss HCPA's claims for lack of personal jurisdiction, or alternatively to transfer venue. HCPA moves to remand the case to Ramsey County.

**DISCUSSION**

**A.    Motion to Dismiss or Transfer**

    **1.    Rule 12(b)(2)**

To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the non-moving party must present a prima facie case that personal jurisdiction exists. See Digi–Tel Holdings, Inc. v. Proteq Telecomm. Ltd., 89 F.3d 519, 522 (8th Cir. 1996). In determining whether the non-moving party has set forth a prima facie case, the Court must

view all evidence in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. Id.

The Court can exercise personal jurisdiction over a nonresident defendant if (1) Minnesota's long-arm statute, Minn. Stat. § 543.19, is satisfied; and (2) the exercise of personal jurisdiction does not offend due process. Id. Because Minnesota's long-arm statute extends the personal jurisdiction of Minnesota courts as far as due process allows, see e.g., In re Minn. Asbestos Litig., 552 N.W.2d 242, 246 (Minn. 1996), the Court need only evaluate whether the exercise of personal jurisdiction comports with the requirements of due process. Guinness Import Co. v. Mark VII Distribs., Inc., 153 F.3d 607, 614 (8th Cir. 1998).

Due process requires that defendants have "certain minimum contacts" with Minnesota "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quotation omitted). Sufficient minimum contacts exist when the "defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). There must be some act by which a defendant "purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). In contrast, contacts that are merely "random," "fortuitous," "attenuated," or that are the result of "unilateral activity of another party or a third person" will not support personal jurisdiction. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (citations and quotations omitted).

The Eighth Circuit has established a five-factor test to determine the sufficiency of a defendant's contacts: (1) the nature and quality of the contacts; (2) the quantity of the contacts; (3) the relation between the contacts and the action; (4) the forum state's interest in the litigation; and (5) the convenience of the parties. Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 648 (8th Cir. 2003). The third factor distinguishes between specific and general jurisdiction. Digi-Tel, 89 F.3d at 522 n.4. "Specific jurisdiction can only be found if the controversy is related to or arises out of the defendant's contacts with the forum state." Johnson v. Woodcock, 444 F.3d 953, 956 (8th Cir. 2006) (quotation omitted).

Defendants may not avoid personal jurisdiction "merely because [they] did not physically enter" Minnesota if they "purposefully directed" their efforts towards Minnesota residents. Burger King Corp., 471 U.S. at 476 (citation and emphasis omitted). Indeed, more than 35 years ago, the Supreme Court concluded that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a [s]tate in which business is conducted." Id. "To determine whether a defendant purposefully established minimum contacts with the forum, we must evaluate 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" Creative Calling Sols., Inc. v. LF Beauty Ltd., 799 F.3d 975, 980 (8th Cir. 2015) (quoting Burger King, 471 U.S. at 479).

Viewing the facts in the light most favorable to HCPA, beginning in August 2019, Defendants reached out to Hang via phone calls and emails, attempting to persuade HCPA to invest in their fund and assuring her that any investment would follow HCPA's investment

6

requirements and Minnesota statutory guidelines. (Hang Decl. ¶¶ 8-18.) After the parties executed the Subscription Agreement, Defendants continued contacting HCPA in Minnesota because Woodstock GP is obligated to send HCPA monthly statements and annual audited financial statements. And at least twice Woodstock GP has transmitted funds withdrawn from HCPA's Minnesota-based back account. (Hang Decl. ¶ 21.) Given the extent of business conducted remotely, especially during the global pandemic, Defendants' argument that they were not physically in Minnesota carries little weight.

Although Reiner was acting as an employee of Woodstock GP, he is also subject to personal jurisdiction in Minnesota. "The United States Supreme Court has 'reject[ed] the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity.'" Henry Law Firm v. Cuker Interactive, LLC, 950 F.3d 528, 533 (8th Cir. 2020) (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13 (1984). The Court evaluates "each defendant's contacts with the forum [s]tate." Calder v. Jones, 465 U.S. 783, 790 (1984). As outlined above, Reiner's contacts are sufficient to establish personal jurisdiction in Minnesota.

Defendants do not argue that they will be inconvenienced by this lawsuit taking place in Minnesota. Rather, they contend that any evidence relating to their conduct is located in New Jersey; though they fail to describe this potential evidence. Likewise, Defendants provide no support for their argument that the permissive forum-selection clause in the parties' agreement should have any bearing on the Court's analysis of whether the parties are inconvenienced.

Additionally, specific personal jurisdiction lies because Defendants' actions "sound in intentional tort." Whaley v. Esebag, 946 F.3d 447, 451 (8th Cir. 2020).

> To establish specific personal jurisdiction under the intentional tort theory set forth in Calder, a plaintiff must make a prima facie showing that 'the defendant's acts (1) were intentional, (2) were 'uniquely' or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—there.'

3M Co. v. Starsiak, No. 20cv1314, 2020 WL 3566718, at *5 (D. Minn. June 26, 2020) (Nelson, J.) (quoting Zumbro, Inc. v. Cal. Nat. Prods., 861 F. Supp. 773, 782-83 (D. Minn. 1994) (Kyle, J.)). The key to whether specific personal jurisdiction exists is whether "the defendant's suit-related conduct . . . create[d] a substantial connection with the forum [s]tate." Walden v. Fiore, 571 U.S. 277, 284 (2014). HCPA makes such a prima facie showing—Defendants intentionally made material misrepresentations aimed at HCPA, which is located in Minnesota, and HCPA lost nearly $5 million dollars as a result.

Ultimately, Defendants sought, secured, and ultimately lost a multimillion-dollar investment from a Minnesota school. Their actions impacted Minnesota residents, namely, HCPA's students and employees, such that the Court may exercise personal jurisdiction over Defendants. Defendants fail to demonstrate that dismissal under Rule 12(b)(2) is warranted.

### 2.    Rule 12(b)(7)

Defendants also move to dismiss the lawsuit under Rule 12(b)(7), arguing that HCPA failed to join an indispensable party, Woodstock LP. Rule 19(b) allows dismissal if joinder of a necessary party is not feasible. The Court exercises discretion to determine whether dismissal is warranted. Under Rule 19, the Court considers whether the absent parties will be prejudiced by a judgment, whether such a judgment would be adequate, and whether the

plaintiff would have an adequate remedy if the action were dismissed. Fed. R. Civ. P. 19(b)(1)-(4).

Defendants fail to recognize that Woodstock GP is "charged with the full responsibility for managing and promoting [Woodstock LP's] purpose and business" and that it manages Woodstock LP's "assets, affairs, and operations." (Compl. ¶ 20.) Further, Defendants provide no authority supporting that Woodstock GP is an improper party to this lawsuit or evidence demonstrating that Woodstock LP cannot be joined under Rule 19(a). Defendants' Motion under Rule 12(b)(7) is denied.

### 3. Rule 12(b)(3) and 28 U.S.C. § 1404(a)

Alternatively, Defendants contend that venue is improper and move to transfer this case to New Jersey, pursuant to Rule 12(b)(3) and 28 U.S.C. § 1404(a). "As the Supreme Court [has] made clear . . . , a forum-selection clause cannot render venue 'improper' under Rule 12(b)(3), and hence that Rule 'is not a proper mechanism to enforce such a clause.'" Ferguson-Keller Assocs., Inc. v. Plano Molding Co., LLC, 274 F. Supp. 3d 916, 918-19 (D. Minn. 2017) (quoting Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex., 571 U.S. 49, 134 (2013) (cleaned up)). Therefore, the Court will consider the alternative request in Defendants' Motion: that the case be transferred pursuant to 28 U.S.C. § 1404(a).

Defendants seek a transfer to New Jersey because Woodstock GP is a New Jersey company and because the $5 million investment was wired there. However, the bulk of Defendants' argument presses Delaware as the proper venue, because the Subscription Agreement's permissive forum-selection clause lists Delaware as a proper venue and jurisdiction for claims arising out of the agreement. But Defendants fail to acknowledge that

a permissive forum selection clause does not mandate the forum. Thus, this argument fails. Further, the Subscription Agreement's choice-of-law provision, which notes that Delaware law applies, is not a sufficient reason to transfer this case, as this Court can readily apply Delaware law. Transfer to either New Jersey or Delaware is not warranted.

**B.   Motion to Remand**

HPCA moves to remand the case to Ramsey County for lack of subject-matter jurisdiction. Because Woodstock GP is a limited-liability corporation, its citizenship is determined by its members' citizenship. See GMAC Com. Credit LLC v. Dillard Dep't Stores, Inc., 357 F.3d 827, 829 (8th Cir. 2004). HPCA argues that Defendants have failed to plead complete diversity of citizenship under 28 U.S.C. § 1332(a), because the Notice of Removal lacked factual allegations necessary to establish the citizenship of Woodstock GP's members. However, after the Motion to Remand was filed, Defendants filed an Amended Notice of Removal setting forth the citizenship of all members of Woodstock GP. (Docket No. 15.) The Amended Notice cures any deficiency because it was filed within 30 days after Reiner waived service. See 28 U.S.C. § 1446(b). Therefore, HCPA's Motion to Remand is denied.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED that**:

1.   Defendant's Motion to Dismiss or Transfer (Docket No. 5) is **DENIED**; and

2.   Plaintiff's Motion to Remand (Docket No. 7) is **DENIED**.

Dated: Thursday, October 7, 2021            *s/ Paul A. Magnuson*
                                            Paul A. Magnuson
                                            United States District Court Judge